UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

ROBIN B. LEWIS,

                              Plaintiff,


               -vs-                                          02-CV-0735C(F)


CITY OF BUFFALO POLICE DEPARTMENT;
ROCCO DIINA, Commissioner;
JAMES DEE, Lieutenant,

                              Defendants.

_____


APPEARANCES:    RICHARD H. WYSSLING, ESQ. (ANNA MARIE RICHMOND,
                ESQ., of Counsel), Buffalo, New York, for Plaintiff.

                HODGSON RUSS LLP (ADAM W. PERRY, ESQ., of Counsel),
                Buffalo, New York, for Defendants.


## INTRODUCTION

        Plaintiff commenced this employment discrimination action with the filing of a

complaint on October 16, 2002 (Item 1).  She alleges violations of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., and the New York State Human Rights

Law, N.Y.Exec. Law § 290, *et seq*.  ("NYSHRL").  Specifically, plaintiff, a woman of African-

American descent, alleges that she was discriminated against on the basis of her race and

gender, was subjected to a hostile work environment, and was retaliated against following

a complaint against her supervisor.  Defendants have moved for summary judgment

dismissing the complaint (Item 55).  For the reasons that follow, the motion is granted, and

the complaint is dismissed.

**BACKGROUND and FACTS[1]**

Plaintiff began her employment with the Buffalo Police Department in 1982.  From 1997 until 2000, she was assigned to the "B" District, which serves downtown Buffalo.  In approximately June 1997, plaintiff was assigned to a special detail in the "B" District known as the Allentown Detail, a community liaison position in the Allentown neighborhood of Buffalo.  The Allentown Detail was a walking patrol, and was generally assigned based on seniority.  It was understood to be a desirable position, as the officer was not required to respond to 911 calls.  Generally, the officer assigned to the Allentown Detail was also assigned a patrol car.

In July 1999, defendant James Dee became plaintiff's supervisor.  In late 1999, plaintiff learned that Dee had referred to plaintiff's daughter, Stacy Lewis, also a Buffalo Police officer, as "Kizzy," the name of a runaway slave in the novel *Roots.*  Dee referred to plaintiff as "Queen Bee," which plaintiff understood to mean "Queen Bitch."  Lt. Dee explained to plaintiff that "Queen Bee" was a reference to plaintiff's status as the senior female officer in the "B" District and that "Kizzy" was a reference to an incident in which Stacy Lewis left the jurisdiction.  Dee also referred to other officers and supervisory staff by various nicknames.  On January 2000, plaintiff asked Dee to stop using derogatory nicknames for her and her daughter.  Dee avers that he stopped using the nicknames at that time.

---

[1]  This factual statement is taken from the complaint (Item 1), defendants' Statement of Uncontested Facts (Item 58),  plaintiff's response to defendants' Statement of Uncontested Facts (Item 67), and the exhibits in support of and in opposition to the motion.

In February 2000, Dee signed and forwarded a request by a white male officer for plaintiff's job assignment.  The Allentown Detail was not up for bid or otherwise open at the time.  In March and April 200, Dee frequently assigned the patrol car that was usually assigned to the Allentown Detail to other officers and advised plaintiff that the Allentown Detail was a "walking post."   He commented that the "real police officers" should be assigned the patrol cars.  In approximately August 2000, Lt. Dee began to rotate the Allentown Detail and another special detail, the Main Street Detail, among the officers in the "B" District.   Lt. Dee referred to plaintiff and the two male officers who had been assigned to the Main Street Detail as "prima donnas" when they complained about the rotation.

Plaintiff states that Dee singled out her and her daughter for abusive derogatory comments.  Plaintiff, Stacy Lewis, and another female officer, Linda Ross-Klubeck, testified that Lt. Dee's conduct toward plaintiff led to the polarization of the "B" District based on gender.  Plaintiff, Stacy Lewis, Ross-Klubeck and Officer Patricia Wrest testified that they were sometimes forced to answer dangerous calls without backup and assistance from other officers in the "B" District.

Plaintiff states that she was unaware of any sexual harassment complaint procedure in the Buffalo Police Department in May 2000.  On May 16, 2000, she filed a formal complaint against Lt. Dee with the City of Buffalo Police Department's Professional Standards Division ("PSD").  Thereafter, between May 16, 2000 and December 31, 2000, plaintiff was accused of misconduct on three occasions.  On May 25, 2000, plaintiff was accused by an anonymous complainant of passing a stopped school bus.  No PSD case was opened, and plaintiff was cautioned to be careful.  On June 14, 2000, plaintiff was

3

accused in a memorandum by another officer of not being at her post on June 10, 2000 during the Allentown Art Festival.  The charges were determined to be unfounded.  On July 26, 2000, plaintiff and her daughter were accused of poor performance in their duties during an incident at the Erie Basin Marina.  The incident was reported to PSD by Joe Giambra of the City of Buffalo Department of Public Works.  A PSD investigation revealed that plaintiff and Stacy Lewis responded to a call from the Marina on July 16, 2000 after an employee reported being harassed by a patron.  Plaintiff and her daughter investigated the incident, spoke to the employee, located the patron, and determined that no crime had been committed.  They advised the patron to apologize and leave the area.  The officers' report of the incident indicated that they ran a warrant check of the patron, yet departmental records indicated that no warrant check had been run at the time.  The PSD investigator also stated that the officers' attitude in handling the call "may have been jeopardized by racial beliefs." (Item 70, Exh. M.)  Plaintiff's report of the incident suggested that it was a misunderstanding between a white woman and an African-American man.  The PSD investigation resulted in verbal counseling for plaintiff and Stacy Lewis.

On September 7, 2000, plaintiff requested a transfer to the Traffic Division.  On September 13, 2000, plaintiff was diagnosed as suffering from "adjustment disorder with anxious and depressed mood and post-traumatic stress symptoms." (Item 70, Exh. N.)  Her transfer was approved on September 28, 2000.  On October 17, 2000, plaintiff's request for injured-on-leave status was denied.  In November 2000, she learned that her complaint against Dee had been resolved.  Dee pled guilty to a charge of using abusive, discourteous, and insolent language, was given a verbal reprimand, and was ordered to attend a cultural diversity training session.  On January 24, 2001, plaintiff returned to work.

On January 31, 2001, she learned that she was being brought up on departmental charges relating to a home confinement check in December 2000.  Plaintiff was one of several officers who were out of work on sick leave on December 11, 2000 and were telephoned to check if they were at home.  Plaintiff was not at home at the time.  A hearing was conducted on February 15, 2001.  During the hearing, plaintiff stared out of the window, reportedly because she was nauseous at the thought of being charged with the violation. During the hearing and in a private meeting following the hearing, defendant Diina berated plaintiff for her discourtesy in failing to look at him directly during the course of the hearing.

On February 16, 2001, plaintiff's doctor ordered her off work.  On March 5, 2001, she filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff returned to work in April 2001.  She received a right to sue letter from the EEOC on July 18, 2002.  In August 2003, plaintiff retired from the Buffalo Police Department after 21 years of service.  The departmental charges resulting from the home confinement check were pending at the time of her retirement and were not resolved.

**DISCUSSION**

Defendants advance the following arguments in support of their motion:  (1) plaintiff has not established that she was subjected to disparate treatment or retaliation; (2) plaintiff cannot establish that she was subjected to a hostile work environment; (3) the Buffalo Police Department lacks the capacity to be sued; (4) the failure to demonstrate liability against the Police Department mandates dismissal of the claims against defendants Diina and Dee; and (5) defendants are entitled to the defense pursuant to *Faragher v. City of*

*Boca Raton*, 524 U.S. 775 (1998) and *Burlington Indus., Inc., v. Ellerth*, 524 U.S. 742 (1998).

## 1.  Summary Judgment Standard

Pursuant to Rule 56, summary judgment may be granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *SCS Communications, Inc. v. Herrick Co.*, 360 F.3d 329, 338 (2d Cir. 2004).  The court will not try issues of fact on a motion for summary judgment, but rather, will determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

Summary judgment is appropriate where the moving party has shown that "little or no evidence may be found in support of the nonmoving party's case.  When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper."  *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223-24 (2d Cir. 1994) (internal citations omitted).  If, however, "'as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.'"  *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004) (quoting *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir.), *cert. denied*, 517 U.S. 1190 (1996)).

6

The moving party has the burden of showing that there are no material facts in dispute, and the court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion. *Bickhardt v. Ratner*, 871 F. Supp. 613 (S.D.N.Y. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).  Thus, "[s]ummary judgment may be granted if, upon reviewing the evidence in the light most favorable to the non-movant, the court determines that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law."  *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir.1993).

## 2.  Disparate Treatment and Retaliation

Defendants argue that plaintiff is unable to establish a prima facie case of disparate treatment or retaliation because she has failed to show that she suffered any adverse employment action.  Plaintiff alleges that Lt. Dee reassigned her from the Allentown Detail and denied her access to a police vehicle, that she was brought up on departmental charges for violation of the sick leave policy and for an incident at the Erie Basin Marina, that she was also accused of misconduct on two other occasions which did not result in formal disciplinary charges, and that Diina retaliated against her by verbally attacking her following the departmental hearing on the sick leave violation.

In the context of a summary judgment motion, the court must analyze both the disparate treatment and retaliation claims using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (noting application of *McDonnell Douglas* burden-shifting framework to discrimination cases); *see also Wilson v. New York City Dept.*

*of Transp.*, 2005 WL 2385866, at *15 (S.D.N.Y. Sept. 28, 2005) (citations omitted) (noting disparate treatment and retaliation claims brought under Title VII are analyzed under *McDonnell Douglas* burden shifting framework).[2]  At the outset, plaintiff has the burden of "proving by the preponderance of the evidence a prima facie case of discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U .S. 248, 252-53 (1981).  To establish a prima facie case of gender- or race-based disparate treatment, plaintiff must show that (1) she belongs to a protected class, (2) she was performing her duties satisfactorily, (3) she suffered an adverse employment action, and (4) the adverse employment action occurred in circumstances giving rise to an inference of discrimination on the basis of her membership in that class.  *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004). Similarly, to make out a prima facie case of retaliation, an employee must show that (1) the employee was engaged in protected activity, (2) the employer was aware of that activity, (3) the employee suffered adverse employment actions, and (4) there was a causal connection between the protected activity and the adverse employment action.  *Collins v. New York Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002); *see also Wilson*, 2005 WL 2385866, at *16 (citing *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)). Plaintiff's initial burden is *de minimis*.  *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir.), *cert. denied*, 534 U.S. 993 (2001).

    If a plaintiff establishes a prima facie case, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the challenged action. *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003); *see McDonnell Douglas Corp. v. Green*, 411 U.S. at 802.

---

[2]  When considering claims brought under the NYSHRL, the court employs the same analysis it uses in Title VII cases.  *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n.1 (2d Cir. 2000).

"[O]nce a minimal prima facie case is proved and the employer's nondiscriminatory explanation has been given, the *McDonnell Douglas* presumptions disappear from the case." *James v. New York Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000). To defeat summary judgment, a plaintiff must provide "admissible evidence . . . [of] circumstances . . . sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Terry v. Ashcroft*, 336 F.3d at 138. The court must "examine the entire record and . . . make the case-specific assessment as to whether a finding of discrimination may reasonably be made." *Zimmerman v. Assocs. First Capital Corp.*, 251 F.3d 376, 382 (2d Cir. 2001).

Similarly, if the plaintiff makes out a prima facie case of retaliation and the defendant articulates a legitimate, non-retaliatory reason for the adverse employment action, the plaintiff "must show that retaliation was a substantial reason for the adverse employment action." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). To avoid summary judgment, the plaintiff must adduce evidence sufficient to raise an issue of fact as to whether the employer's reason was merely a pretext for retaliation. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir.1998).

With respect to plaintiff's claim of disparate treatment, it is undisputed that plaintiff was a member of a protected class and was performing her duties in a satisfactory manner. The central issue is whether she suffered an adverse employment action. Plaintiff was not terminated or demoted and did not lose wages, responsibilities, or benefits. She preferred the Allentown Detail and was displeased when Lt. Dee began to rotate the Allentown Detail among the other officers on the shift. The parties seem to

agree that the Allentown Detail was a preferable assignment, as it involved community relations and did not require the officer to respond to 911 calls. Historically, the Allentown Detail had been generally assigned to a senior officer in the district, as was the case until Lt. Dee began the rotation. Plaintiff was also displeased when other officers were assigned the patrol car which was normally assigned to the senior officer on the Allentown Detail.

In order to establish that an adverse employment action resulted from a defendant's alleged discrimination, a plaintiff must demonstrate a materially adverse change in the terms and conditions of employment. *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). To be materially adverse, a change in working conditions must be

> more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices. . . unique to a particular situation.

*Galabya v. New York City Bd. of Educ.*, 202 F.3d at 640 (citations and internal quotation marks omitted); *accord Demoret v. Zegarelli,* 451 F.3d 140, 151 (2d Cir. 2006); *Patrolmen's Benevolent Assoc. v. City of New York,* 310 F.3d 43, 51 (2d Cir. 2002), *cert. denied,* 538 U.S. 1032 (2003). Thus, for example, an adverse employment action is not established by proof of excessive work, denials of requests for leave with pay and a supervisor's general negative treatment, *Fridia v. Henderson*, 2000 WL 1772779, *7 (S.D.N.Y. Nov. 30, 2000), or by evidence of being yelled at, receiving unfair criticism, or receiving unfavorable schedules or work assignments. *Katz v. Beth Israel Med. Ctr.*, 2001 WL 11064, *14 (S.D.N.Y. Jan. 4, 2001). The Second Circuit has held that "[a]dverse employment actions

include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand" as well as involuntary transfer to a less desirable location or assignment such as, in the case of a teacher, assignment of lunchroom duty, reduction of class preparation periods, and assignment to a classroom on the fifth floor which aggravated the plaintiff's physical disabilities.  *See Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999); *Bernheim v. Litt*, 79 F.3d 318, 324-26 (2d Cir. 1996).

Here, the evidence indicates that the Allentown Detail was a walking patrol, and despite historical precedence for assignment of a patrol car to the officer assigned to the Detail, the court finds that assignment of the patrol car to other officers was a "mere inconvenience" that did not result in a materially adverse change in the terms and conditions of plaintiff's employment.  *Galabya v. New York City Bd. of Educ.*, 202 F.3d at 640.  In contrast, however, it is not apparent that the reassignment of plaintiff from the Allentown Detail was merely an inconvenient and minor alteration of her job responsibilities.  The involuntary reassignment to less desirable responsibilities has been found to be a materially adverse change in the terms and conditions of plaintiff's employment.  *See Morris v. Lindau*, 196 F.3d at 110 (lesser actions than dismissal, reduction in pay, or demotion in rank may also be considered adverse employment actions); *Bernheim v. Litt*, 79 F.3d at 324-26 (adverse employment actions may include negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods, failure to process teacher's insurance forms, transfer from library to classroom teaching as an alleged demotion, and assignment to classroom on fifth floor which aggravated teacher's physical disabilities).  A transfer may be an adverse personnel action if it moves the employee from a more desirable to a less

11

desirable position, *de la Cruz v. N.Y. City Human Res. Admin. Dept. of Soc. Servs.*, 82 F.3d 16, 21 (2d Cir.1996) (holding transfer to allegedly less prestigious assignment to be adverse employment action), or if it is undertaken in order to harass the employee. *See Terry v. Ashcroft*, 336 F.3d 128, 144 (2d Cir. 2003) (finding sufficient evidence to conclude retaliatory transfer intended to "screw" plaintiff was adverse personnel action); *see also Meder v. City of New York*, 2007 WL 2937362, *7 (E.D.N.Y. Oct. 9, 2007) (assignment to less desirable class and then to daily teaching assignments instead of a permanent classroom constituted materially adverse employment actions).

Additionally, plaintiff has alleged that the rotation of the Allentown Detail occurred after she complained to Lt. Dee about his use of offensive nicknames toward her and her daughter. Thus, a reasonable jury could find that the alleged adverse employment action gave rise to an inference of discrimination based on gender and race. Accordingly, the court finds that plaintiff has set out a prima facie case of disparate treatment with regard to the rotation of the Allentown Detail.

Defendants argue that the rotation of the Allentown Detail was undertaken for legitimate, non-discriminatory reasons. In his Affirmation (Item 57, Exh. D), defendant Dee stated that he decided to rotate the Allentown and Main Street Details in the interest of fairness among all the officers of the platoon. The Allentown and Main Street Details were relatively easy assignments, as they did not involve answering 911 calls. The Details were not contractually mandated, and were assigned if staffing levels permitted. Two white male officers generally were assigned to the Main Street Detail, and they too were not happy when Lt. Dee decided to rotate the Main Street Detail (Item 57, Exh. D, ¶¶ 11-22).

As defendants have offered a legitimate, non-discriminatory reason for the rotation of the Allentown Detail, the burden shifts back to plaintiff to show that this reason is pretextual.  In support of her argument, plaintiff states that the Allentown and Main Street Details were not rotated on the opposite wheel.[3]  It is, however, undisputed that Lt. Dee did not supervise the other wheel in the "B" District, and the lack of rotation on the other wheel is irrelevant.  Plaintiff admitted in her deposition that the Allentown Detail rotated among all officers in the "B" District regardless of gender or race.  Item 57, Exh. C, p. 280.

Plaintiff also argues that Lt. Dee's decision to rotate the Allentown detail was based on a general anti-female animus in the "B" District, citing the deposition testimony of Stacy Lewis, Linda Ross-Klubeck, and Patricia Wrest.  Stacy Lewis testified that she felt unwelcome in the Buffalo Police Department (Item 69, Exh. B, p. 11).  She acknowledged the conflict between Lt. Dee and her mother and concluded without any proof that this was based on gender.  *Id.,* pp. 23-25.  She testified that she heard that other officers would not respond to back her up and stated, without specifics, that the distribution of special details favored the male officers in the district.  *Id.,* pp. 23, 27.  Stacy Lewis also testified that Lt. Dee "belittled" her mother, minimizing her experience and seniority, by assigning patrol cars to officers who were assigned to "real" patrols.  *Id.,* p. 72.  Linda Ross-Klubeck testified that she was not well-liked because of her friendship with plaintiff (Item 69, Exh. C, p. 35).  Other officers were jealous of plaintiff's assignment to the Allentown Detail and so would not back up Ross-Klubeck.  *Id.,* p. 36.  Ross-Klubeck also testified that the lack of backup was a "male-female thing," but had no proof of this, only a "feeling."  *Id.,* p. 37.

---

[3]  The B District is staffed pursuant to a shift-and-wheel system.  Two separate platoons of officers split each of the regular shifts over a two week period.

Finally, Patricia Wrest testified that she was prejudged because she was Ross-Klubeck's partner (Item 69, Exh. D., p. 47).  She heard Dee's use of nicknames, including "Kizzy" for Stacy Lewis, and felt they were inappropriate.  *Id.,* p. 39.  Wrest also testified that there were times that she did not receive backup and felt it was due to her association with Ross-Klubeck and, by extension, the plaintiff.  *Id.,* p. 9.

Plaintiff's proof of pretext is inadequate to survive summary judgment.  Lewis, Wrest, and Ross-Klubeck testified that they did not receive adequate backup, but they offered no evidence that this was a result of a racial or gender bias.  Accepting the truth of the testimony, it is apparent that plaintiff and Lt. Dee did not get along, and Stacy Lewis, Linda Ross-Klubeck, and Patricia Wrest may have suffered from their association with plaintiff.  However, there is absolutely no proof that the failure of "B" District officers to provide backup to these female officers was based on racial bias and only speculation and suspicion that it was the result of gender bias.  Evidence of disparate treatment cannot be based on conclusory allegations.  *See Finney v. Planned Parenthood of N.Y. City, Inc.*, 2003 WL 22928730, at * 4 (S.D.N.Y. Dec.10, 2003), *aff'd*, 110 Fed. Appx. 194 (2d Cir. 2004) (granting summary judgment where only evidence of disparate treatment was plaintiff's own conclusory allegations); *Griffin v. Ambika Corp.*, 103 F. Supp. 2d 297, 308 (S.D.N.Y. 2000) ("Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." (internal quotations and citations omitted)).  As plaintiff has failed to sustain her burden of showing that the defendant's proffered reason for rotating the Allentown Detail and assigning patrol cars was pretext for gender or racial discrimination, she has failed to establish a prima facie case of disparate treatment, and the claim is dismissed.

With respect to plaintiff's claims of retaliation, plaintiff must show that she was engaged in protected activity, her employer was aware of that activity, she suffered adverse employment actions, and there was a causal connection between the protected activity and the adverse employment action. *Collins v. New York Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002). Here, plaintiff has shown that she complained to Lt. Dee about his use of derogatory nicknames and filed a formal complaint with the PSD on May 16, 2000. Lt. Dee was aware of the complaint against him, because there is proof that he was forced to answer to the charges. Plaintiff argues that all of the acts alleged (other than defendant Dee's use of derogatory nicknames) were retaliatory in that they occurred after she made the formal complaint against Lt. Dee. These include the above-mentioned rotation of the Allentown detail and assignment of the patrol car, and the instances of disciplinary charges filed against her. *See* Plaintiff's Memorandum of Law, Item 71, pp. 29-31.

In considering plaintiff's retaliation claims, the court notes that the "adverse employment action" standard is different than that applied to discrimination clams. In *Burlington N. & Santa Fe Ry v. White,* ___U.S.___, 126 S. Ct. 2405, at 2415 (2006), the Supreme Court stated that a retaliatory action is "materially adverse" if "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination" (internal quotations and citations omitted). Whether a particular action is materially adverse "depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* at 2417 (internal quotation marks omitted). While the assignment of a patrol car to other officers is not sufficient to dissuade an employee from making or

supporting a charge of discrimination, the rotation of the Allentown detail and the assignment of plaintiff to regular patrols is sufficient to constitute an adverse employment action. "The assignment to arduous tasks, even without a change of job title, is one type of adverse action that could deter Title VII protected activity." *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 363 (S.D.N.Y. 2006); *see White*, 126 S. Ct. at 2416 ("Common sense suggests that one good way to discourage an employee such as [plaintiff] from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable."); *Kessler v. Westchester County Dep't of Soc. Serv.*, 461 F.3d 199, 209 (2d Cir. 2006) (noting that plaintiff was allowed to keep title after transfer, but lost supervisory authority and had to "undertake clerical tasks and to perform data entry alongside employees several grades below his").

Additionally, plaintiff has shown that she was accused of misconduct on four occasions. On May 25, 2000, she was reported to have passed a stopped school bus. No PSD file was opened, and plaintiff was merely told to be careful. On June 14, 2000, plaintiff was accused of being away from her post during the Allentown Art Festival. This charge was determined to be unfounded, and no PSD file was opened. On July 26, 2000, plaintiff and her daughter were accused of mishandling a 911 call at the Erie Basin Marina. A PSD file was opened, and plaintiff was verbally counseled about the incident. Finally, plaintiff was brought up on charges of failing to be home when she was out of work on sick leave. "Just as a shift to less desirable tasks is a disincentive to employees' protected activity, so too can a supervisor use the 'embarrassment and anxiety' that accompanies excessive monitoring to dissuade employees from engaging in protected activity." *Hill v.*

16

*Rayboy-Brauestein*, 467 F. Supp. 2d 363-64; *Castro v. N.Y. City Bd. of Educ. Pers*., 1998 WL 108004, at *7 (S.D.N.Y. Mar.12, 1998). Thus, plaintiff has shown adverse employment actions that occurred after she engaged in protected activity.

Plaintiff must also show a causal connection between the protected activity and the adverse employment action. A causal link between adverse action and retaliatory motive may be proven indirectly by showing that protected activity was closely followed with discriminatory action. *Gilford v. City of New York*, 2004 WL 1574695, at *7 (S.D.N.Y. July 14, 2004), *aff'd*, 136 Fed. Appx. 390 (2d Cir. 2005). Here, plaintiff has shown a temporal link between the protected conduct and the accusations of professional misconduct. For purposes of the motion, the court will assume that plaintiff has set forth a prima facie case of retaliation.

As plaintiff has set forth a prima facie case of retaliation, the burden shifts to the defendant to show a legitimate, non-discriminatory reason for the challenged actions. Here, Lt. Dee avers that the Allentown Detail, a walking patrol, was a relatively easy assignment, as the officer was not required to respond to 911 calls. Item 55, Exhibit D, ¶16. In the interest of fairness, Lt. Dee began to rotate the Allentown Detail and another discretionary detail, the Main Street Detail, in August 2000 among all officers in the platoon. *Id.,* ¶ 20. Lt. Dee stated that the decision to rotate these details had nothing to do with Plaintiff's race, gender, or previous complaint. *Id.,* ¶ 22. As with plaintiff's claim of disparate treatment, defendants have offered legitimate, non-discriminatory reasons for the rotation of the Allentown Detail, and plaintiff has failed to offer any proof that the rotation of the Allentown Detail was a pretext for retaliation.

17

With regard to plaintiff's allegation that she was subjected to a home confinement check, defendants have offered a memorandum that reflects that she was one of 24 officers who were telephoned on December 11, 2000 to ensure that they were at home on sick leave.  Item 55, Exh. G.  Plaintiff admits that she was not home at the time and that she violated departmental policy by leaving her home on a work day, although she argues that she had recently been transferred to the Traffic Division and was not aware of her work schedule.  Later, the matter was dropped because her retirement was pending.  Item 55, Exh. C., p. 214.  Defendants have shown that the confinement check was conducted in a non-discriminatory manner, and that PSD cases were opened for all officers who were in violation of the policy.  Plaintiff has failed to offer any proof that the confinement check was a pretext for retaliatory discrimination.

Plaintiff was also forced to answer charges that she mishandled an incident at the Erie Basin marina.  This incident was reported to the PSD by Joe Giambra of the Department of Public Works because he was concerned about the way plaintiff and her daughter had handled an incident with one of his employees.  This was not an investigation commenced by the individual defendants or the Police Department.  The court has reviewed the report of the PSD investigation, and it is apparent that it was a legitimate and non-discriminatory investigation of a citizen's complaint.  Plaintiff has offered no proof that the PSD investigation of this incident was undertaken to retaliate against her for engaging in protected activity.

Additionally, plaintiff complains that she was accused of misconduct on two other occasions.  Neither of these incidents resulted in PSD investigations or formal discipline and were determined to be unfounded.  One accusation was the result of an anonymous

18

report, and the other was in a memorandum by another officer. These two incidents do not rise to the level of a materially adverse employment action for purposes of the prima facie case. It cannot be said that unfounded accusations of misconduct by anonymous persons or coworkers which result in no consequences to the employee would dissuade a reasonable person from engaging in protected activity.

Finally, plaintiff alleges that she was verbally berated by defendant Diina during and after her hearing on the sick leave violation. She admits that she stared out of the window while the charges were being read to her, and conceded that she should have apologized for her behavior. *Id.,* pp. 177-78, 181. Defendants have offered a legitimate, non-discriminatory reason for Diina's action, and plaintiff offers no proof that Diina's actions were a pretext for discriminatory retaliation.

Plaintiff has failed to offer any evidence that defendants rotated the Allentown Detail or subjected her to accusations of misconduct and/or disciplinary proceedings in retaliation for her protected activity. She has failed to sustain her burden on the motion for summary judgment, the defendant's motion is granted, and the claims of disparate treatment and retaliation are dismissed.

### 3. Hostile Work Environment

Defendants argue that plaintiff has failed to establish an unlawfully hostile work environment. In order to prevail on a discrimination claim based on a hostile work environment theory under Title VII, a plaintiff must show: "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of . . . her work environment, and (2) that a specific basis exists for imputing

19

the conduct that created the hostile environment to the employer." *Petrosino v. Bell Atl.*, 385 F.3d 210, 221 (2d Cir. 2004) (citations and quotations omitted); *see also Alfano v. Costello,* 294 F.3d 365, 373 (2d Cir. 2002) (same (citation omitted)).

"The first element of a hostile work environment claim has both an objective and subjective component: 'the misconduct must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive.'" *Petrosino*, 385 F.3d at 221 (quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753 (1998). To maintain a hostile work environment claim, plaintiff "'must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were "sufficiently continuous and concerted" to have altered the conditions of her working environment.'" *Alfano*, 294 F.3d at 374 (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir.2000)); *accord Harris*, 510 U.S. at 21; *Thomas v. New York City Health & Hosps. Corp .*, 2004 WL 1962074, at *12 (S.D.N.Y. Sept. 2, 2004) ( as a general rule, isolated instances of name-calling and offensive remarks alone are ordinarily not severe enough to alter the conditions of employment). Whether the environment may be considered sufficiently hostile or abusive to support a hostile work environment claim is to be measured by the totality of the circumstances, including (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a "mere offensive utterance"; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted to the

plaintiff.  *See Harris v. Forklift Sys., Inc.*, 510 U.S. at 23.  The factors outlined above must be considered "cumulatively," so that the court can "obtain a realistic view of the work environment."  *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (quoting *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 444 (7th Cir. 1994)). This includes evaluating the "quantity, frequency, and severity" of the incidents. *Id.*

With respect to the imputation requirement, the general rule is that "[w]hen harassment is perpetrated by the plaintiff's coworkers, an employer will be liable if the plaintiff demonstrates that 'the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.'"  *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (quoting *Karibian v. Columbia Univ.*, 14 F.3d 773, 780 (2d Cir.), *cert. denied*, 512 U.S. 1213 (1994)); *accord Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 72 (2d Cir. 2000).  In addition, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).  An employee is deemed to possess supervisory status if he has "the authority to affect the terms and conditions of the victim's employment."  *Mack v. Otis Elevator Co.*, 326 F.3d 116, 126 (2d Cir.), *cert. denied*, 540 U.S. 1016 (2003).

Here, accepting the truth of all plaintiff's allegations of hostile behavior by defendant Dee, the record is devoid of admissible evidence from which a rational factfinder could find that plaintiff was intimidated, ridiculed, or insulted because of her race or gender.  In what appears to be an acknowledgment of the lack of proof of discrimination, plaintiff states in

21

her memorandum of law that Lt. Dee subjected her to a "daily, or nearly-daily barrage of inappropriate and hostile comments, *many of them based on gender*," Item 71, p. 27 (emphasis added).  In order to prevail on her claim of hostile work environment, plaintiff must show that the defendant's abusive behavior is rooted in discrimination.  Lt. Dee admitted that he called plaintiff "Queen Bee" but states that he stopped when plaintiff complained.  It is apparent that "Queen Bee" is a race-neutral nickname and, while it denotes gender, it is not offensive or discriminatory.  There is evidence that another female officer used the nickname herself to denote her seniority (Item 57, Exh. E., pp. 76-77) and Linda Ross-Klubeck testified that the nickname referred to a senior female officer (Item 69, Exh. C., p. 57).  Plaintiff also alleges that Lt. Dee called her a "prima donna" when she complained about the rotation of the Allentown detail.  The record indicates that Lt. Dee called two other male officers by the same unflattering name when they complained about the rotation of the Main Street Detail.  It is undisputed that Lt. Dee repeatedly commented that plaintiff was not a "real officer" when she was on the Allentown detail, and stated that the patrol cars should be assigned to "real officers."  Plaintiff may have legitimately perceived this to be a slight on her seniority and experience, but there is nothing race- or gender-based in this criticism, however harsh or unfair.

There is proof that Lt. Dee used nicknames for other officers and supervisors, some of which could be perceived as inappropriate and even derogatory.  Lt. Dee's use of the name "Kizzy" for Stacy Lewis contains racial overtones, as it is the name of a runaway slave in the novel "Roots."  However, the isolated use of this nickname in the presence of others, not directly to plaintiff or her daughter, cannot be viewed as sufficiently hostile and abusive so as to alter the conditions of the work environment.

22

Plaintiff also alleges that the hostility toward plaintiff "spilled over to other female officers as well."  Item 71, p. 27.  Officers Stacy Lewis, Linda Ross-Klubeck, and Patricia Wrest all testified that hostility in "B" District toward plaintiff affected them as well. However, there is no evidence in the record to suggest that any hostility toward plaintiff was based on gender or race, but rather was the result of a poor working relationship with Lt. Dee.  *See, e.g., Neratko v. Frank*, 31 F. Supp. 2d 270, 284 (W.D.N.Y.1998) ("Personal animosity is not the equivalent of . . . discrimination and is not proscribed by Title VII. The plaintiff cannot turn a personal feud into a . . . discrimination case by accusation.")

A hostile working environment is unpleasant to endure.  Nonetheless, "[t]he Supreme Court has stated clearly that the antidiscrimination laws are not to be viewed as a 'general civility code.'"  *Bush v. Fordham Univ.*, 452 F. Supp. 2d 394, 413 (S.D.N.Y. 2006) (citing *Faragher v. City of Boca Raton*, 524 U.S. at 778).  Thus, Title VII requires that plaintiff show evidence that she was discriminated against because of her gender or race, and this she has not done.  *See Richardson v. N.Y. State Dep't of Corr. Serv.,* 180 F.3d 426, 440 (2d Cir. 1999); *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d at 359; *Bush,* 452 F. Supp. 2d at 413 ("[T]he Second Circuit has unambiguously stated that only conduct prompted by plaintiff's race or national origin contributes to a hostile work environment claim.").  Accordingly, plaintiff's hostile work environment claim under Title VII must be dismissed.  As plaintiff's Title VII claims are dismissed, the claims pursuant to the NYSHRL are also dismissed.  It is unnecessary to address defendants' arguments regarding the *Farahger/Ellerth* defense, the lack of capacity defense, and the liability of the individual defendants pursuant to the NYSHRL.

23

## CONCLUSION

The defendants' motion for summary judgment (Item 55) is granted, and the complaint is dismissed.  Judgment shall be entered in favor of defendants.

So ordered.

                                            \s\ John T. Curtin
                                                  JOHN T. CURTIN
                                        United States District Judge

Dated: November   19 , 2007
p:\opinions\02-735.nov707